Filed 7/28/22  P. v. Johnson CA2/3

# NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## SECOND APPELLATE DISTRICT

## DIVISION THREE

| | |
|---|---|
| THE PEOPLE,<br><br>      Plaintiff and Respondent,<br><br>v.<br><br>BILLY GEORGE JOHNSON,<br><br>      Defendant and Appellant. | B307427<br><br>(Los Angeles County<br>Super. Ct. No. TA007318) |

APPEAL from an order of the Superior Court of Los Angeles County, John J. Lonergan, Jr., Judge.  Reversed and remanded with directions.

Nancy J. King, under appointment by the Court of Appeal, for Defendant and Appellant.

Rob Bonta, Attorney General, Lance E. Winters, Chief Assistant Attorney General, Susan Sullivan Pithey, Assistant Attorney General, Daniel C. Chang and Scott A. Taryle, Deputy Attorneys General, for Plaintiff and Respondent.

————————————————

Billy George Johnson appeals from the order denying his petition for resentencing under Penal Code[1] former section 1170.95 (now § 1172.6).[2]

Johnson raises several arguments on why the trial court erred. Most pertinent, Johnson contends the record of conviction cannot conclusively refute the possibility that he was convicted of second degree murder under a theory where malice was imputed based solely on his participation in a crime, which is no longer a valid theory following passage of Senate Bill No. 775 (2021–2022 Reg. Sess.) (Senate Bill 775). We agree and reverse the order and direct the trial court to issue an order to show cause and to hold an evidentiary hearing in accordance with that section.

**FACTUAL AND PROCEDURAL BACKGROUND**

## I.     Johnson's 1992 conviction.

Three principals were involved in the senseless slaying of Jimmy Dawson: the instigator, the shooter and Johnson. The shooting was instigated by codefendant Artie Gilbert when he made an all too familiar gang challenge to Dawson and Sean Rowe. Gilbert did not like Dawson's response, so he punched Dawson, knocking him to the ground. Gilbert escalated the confrontation by calling for confederates to get a gun. and a third, unidentified man, emerged from a nearby vehicle. Dawson and Rowe fled, with the third man chasing after them firing a gun. Tragically, Dawson was struck and killed by the gunfire.

---

[1] All further statutory references are to the Penal Code.

[2] Effective June 30, 2022, section 1170.95 was renumbered to section 1172.6, with no change in text. (Stats. 2022, ch. 58, § 10.)

Arrest warrants were issued alleging that Gilbert committed murder and willful, deliberate and premediated attempted murder with a principal arming allegation, and Johnson was an accessory after the fact to these crimes (§§ 187, subd. (a), 664, 12022, subd. (a)(1), 32). By the time the jury trial was held, Johnson was facing the same charges as Gilbert.

At trial, the prosecutor argued that the third man, who was never apprehended, was the shooter and Gilbert and Johnson were aiders and abettors. The jury was instructed on various theories, including first degree murder, implied malice second degree murder (CALJIC No. 8.31) and direct aiding and abetting (CALJIC No. 3.01). The jury was not instructed on the felony-murder theory or the natural and probable consequences doctrine. The jury found Johnson and Gilbert guilty of first degree murder and willful, deliberate and premediated attempted murder, and found true the allegations that a principal was armed with a firearm.

Johnson and Gilbert moved for a new trial pursuant to section 1181, subdivision 6, or in the alternative, for a reduction to second degree murder or manslaughter.[3] At the hearing, the trial court's focus was on what acts, if any, did Johnson engage in

---

[3] Section 1181, subdivision 6, provides in relevant part: "When the verdict or finding is contrary to law or evidence, but if the evidence shows the defendant to be not guilty of the degree of the crime of which he was convicted, but guilty of a lesser degree thereof, or of a lesser crime included therein, the court may modify the verdict, finding or judgment accordingly without granting or ordering a new trial."

demonstrating *express malice*.[4]  The trial court first ruled on
Gilbert's motion.  The trial court concluded that Gilbert's conduct
after he unilaterally escalated the confrontation from a gang
challenge to a shooting demonstrated Gilbert's express malice.[5]
In contrast, the trial court determined that because Johnson did
not engage in any further acts, he did not manifest express
malice.  The trial court made the following comments:

Johnson "was not seen with a gun, we hear no words
spoken by Mr. Johnson.  The only thing else we have with regard
to Mr. Johnson is the fact that he perhaps drove the car away.
[¶] . . . [¶]  Now, with all of that, I cannot say that this evidence
supports a first degree murder conviction.  I can see that it
supports a second degree murder conviction.  His culpability is
not the same extent as Mr. Gilbert's.  His main problem was
driving the car, being in the car with the gun, knowing there was
a gun, walking outside—getting out of the car and driving away
with Mr. Gilbert after the shooting.  But I think it's a reasonable
inference that he knew, or had a reasonable expectation of

---

[4] The court stated, "So let's focus in on the actions
[Johnson] took.  I think there's different evidence in the record to
support the fact that [Johnson] was aiding and abetting the
initial confrontation.  The initial encounter.  The concern I have
is one that encounter, whatever it was, after the words git the gat
cuz were issued or uttered, what was [Johnson's] involvement
from then on?"

[5] The court stated, "Now, as far as the specific intent or the
expressed malice is concerned  with respect to Mr. Gilbert, I
think we can see that just from the actions from then on."

4

knowing that there was going to be a shooting and that shooting could in fact escalate into a death."[6]

Instead of granting Johnson a new trial, the trial court exercised its discretion to reduce Johnson's convictions to second degree murder and struck the willful, deliberate and premediated finding as to the attempted murder charge. Johnson was thereafter sentenced to 16 years to life.[7]

In 2019, Johnson filed a pro se petition for resentencing pursuant to section 1172.6 as to his murder conviction.[8]

In 2020, the district attorney filed a response arguing that Johnson was ineligible for relief because the jury was not instructed on the felony-murder rule or the natural and probable consequences doctrine. Appointed counsel filed four supplemental petitions that included Gilbert's parole hearing testimony, Johnson's statement recounting the details of the incident, and a partial transcript of the motion for new trial

---

[6] Johnson argues that this language demonstrates that the trial court relied on the natural and probable consequences theory for this reduction, while the Attorney General contends this language is consistent with implied malice. As discussed below, we need not resolve this dispute. Even assuming Johnson was convicted of murder as an aider and abettor under an implied malice theory as advanced by the Attorney General, recent case law informs us that the standard jury instructions for aiding and abetting implied malice murder are flawed.

[7] After Gilbert's motion for a new trial was denied, he was sentenced to 26 years to life.

[8] Johnson's attempted murder conviction was not a part of his original petition.

where the trial court reduced the murder conviction to second degree.  On August 25, 2020, the trial court held a hearing.  In an oral pronouncement, the court summarily denied the petition: "[T]his is not the normal run-of the-mill [1172.6] by any means.  Mr. Johnson was a co-defendant in a case that clearly co-defendant Gilbert was clearly the aggressor in this situation and ultimately resulted in the death of the victim.  [¶]  And, however, as the People presented in their papers, ultimately the finding under this statute is the court has to deny the petition because the petitioner is not entitled to relief as a matter of law for the following reason.  And that he was not prosecuted under the felony murder or murder under the natural and probable consequences doctrines.  The jury was not given the natural and probable consequence[s] instruction.  We do have the instructions. . . .  [¶]  With that said, some of the discussions we had is the equities seem a little out of balance is in the aggressor is now out and free.  He was paroled after his third parole hearing."[9]

Thereafter, the trial court entered a written order summarily denying the petition.  In addition to repeating its finding, that Johnson was not eligible for relief because the jury was not instructed on the felony-murder rule and the natural and probable consequences theory, the court also wrote that even if Johnson was eligible for relief, the court would nonetheless deny relief based upon its review of the facts as outlined in the original appellate opinion.

---

[9] Gilbert was paroled in 2016.

**DISCUSSION**

The trial court's denial of Johnson's petition without issuing an order to show cause is a purely legal conclusion, which we review de novo. (*People v. Murillo* (2020) 54 Cal.App.5th 160, 167, review granted Nov. 18, 2020, S264978.)

I. **Overview of section 1172.6.**

Effective January 1, 2019, Senate Bill No. 1437 (2017–2018 Reg. Sess.) (Senate Bill 1437) narrowed accomplice liability for murder under the felony-murder rule and the natural and probable consequences doctrine. (*People v. Lewis* (2021) 11 Cal.5th 952, 957 (*Lewis*); *People v. Gentile* (2020) 10 Cal.5th 830, 842–843 (*Gentile*).) Specifically as to the issues raised here, it eliminated the natural and probable consequences doctrine by adding section 188, subdivision (a)(3), which states that malice shall not be imputed to a person based solely on his or her participation in a crime. (*Gentile*, at p. 843.)

Senate Bill 1437 also added section 1172.6, which created a procedure whereby persons convicted of murder under a now-invalid felony murder or natural and probable consequences theory may petition the trial court to vacate the murder conviction and resentence the petitioner on any remaining counts. (*Lewis, supra*, 11 Cal.5th at p. 959; *Gentile, supra*, 10 Cal.5th at p. 843.) A petitioner is eligible for relief if he or she: (1) was charged with murder by means of a charging document that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) was convicted of first or second degree murder; and (3) could no longer be convicted of first or second degree murder due to the changes to sections 188 and 189 effectuated by Senate Bill 1437. (§ 1172.6, subd. (a).)

7

If the petition contains all the required information, including a declaration by the petitioner that he was convicted of murder and is eligible for relief (§ 1172.6, subd. (b)(1)(A)), section 1172.6, subdivision (c) requires the trial court to appoint counsel to represent the petitioner, if requested; to direct the prosecutor to file a response to the petition and permit the petitioner to file a reply; and to determine if the petitioner has made a prima facie showing that he is entitled to relief. (*Lewis, supra*, 11 Cal.5th at pp. 959–960.)

"Like the analogous prima facie inquiry in habeas corpus proceedings, ' "the court takes petitioner's factual allegations as true and makes a preliminary assessment regarding whether the petitioner would be entitled to relief if his or her factual allegations were proved. If so, the court must issue an order to show cause." ' " (*Lewis, supra*, 11 Cal.5th at p. 971.) While the trial court must accept a petitioner's allegations as true because the prima facie evidentiary bar is low, the trial court may properly engage in a limited examination of the record of conviction so that the trial court can quickly dispose of petitions that are "clearly meritless." (*Ibid*.) Trial courts are to refrain from engaging in " 'factfinding involving the weighing of evidence or the exercise of discretion' " (*id.* at p. 972), because under the current "framework the section [1172.6], subdivision (c) inquiry is a test of the petitioner's pleaded allegations, not an inquiry into the truth of those allegations and the credibility of the evidence on which they may rely" (*People v. Davenport* (2021) 71 Cal.App.5th 476, 483).

Thus, a trial court may deny relief at this stage only if the court determines petitioner is ineligible for relief as a matter of law. (*Lewis, supra*, 11 Cal.5th at pp. 971–972.) A petitioner is

ineligible for relief as matter of law only if the record of conviction *conclusively* establishes that the petitioner was convicted under a theory of liability that remains viable under current law. (*People v. Duchine* (2021) 60 Cal.App.5th 798, 815.)

## II. Senate Bill 775.

During the pendency of Johnson's appeal, the Governor approved Senate Bill 775, which further amended section 1172.6 effective January 1, 2022. In addition to expanding the list of eligible crimes, the new legislation clarified the procedures, the rules of evidence, and the burden of proof in adjudicating resentencing petitions. Most germane to this appeal, the following italicized text was added to section 1172.6, subdivision (a), which we will refer to as the imputed malice theory:

"A person convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime* . . . may file a petition with the court that sentenced the petitioner to have the petitioner's . . . conviction vacated."[10]

## III. Johnson's eligibility for relief under section 1172.6 as amended by Senate Bill 775.

After the original briefing was completed, this court requested additional briefing on the impact of Senate Bill 775.[11]

---

[10] The same italicized language was added to section 1172.6, subdivision (a)(1).

[11] In Johnson's reply brief, which was filed shortly after the effective date of Senate Bill 775, he contended that Senate Bill 775 entitled him to an order to show cause as to his

9

Neither party seems to dispute that Johnson is entitled to the ameliorative benefits of Senate Bill 775,[12] however, they disagree on the application of Senate Bill 775 to this case.

The Attorney General contends that Johnson's jury was not instructed on any "*other theory under which malice is imputed*" and, therefore, the changes enacted under Senate Bill 775, including resentencing on his attempted murder conviction, are inapplicable here. In addition, the Attorney General maintains that by adding the "other theory under which malice is imputed" language, the Legislature only intended to make the text of section 1172.6 consistent with previously amended section 188.[13]

Johnson responds that Senate Bill 775's text amending section 1172.6 established an additional basis for relief under which he qualifies. Specifically, Johnson argues instructional shortcomings in implied malice and aiding and abetting allowed him to be prosecuted for murder under "[an]other theory under which malice is imputed to a person based solely on that person's

---

attempted murder conviction. This court, thus, gave the Attorney General an option to brief Senate Bill 775's application, if any, on the issues in this case, and granted Johnson an opportunity to file a response.

[12] See *People v. Garcia* (2018) 28 Cal.App.5th 961, 973 (an ameliorative criminal statute is generally presumed to apply to all cases that are not final when the statute becomes effective) and *People v. Montes* (2021) 71 Cal.App.5th 1001, 1006 to 1007 (applying Senate Bill 775 retroactively).

[13] Senate Bill 1437 previously added similar language to section 188, subdivision (a)(3): "Malice shall not be imputed to a person based solely on his or her participation in a crime."

participation in a crime." Johnson adds that his attempted murder conviction, which is now subject to resentencing following Senate Bill 775, is also infirm for the same reason. Therefore, Johnson argues, an order to show cause should issue as to both convictions.

### A. *Recent case law.*

Two recent cases offer guidance in addressing the issues we are confronted with here.

*People v. Powell* (2021) 63 Cal.App.5th 689 (*Powell*), illuminated the inadequacy of the standard CALCRIM direct aiding and abetting instructions for implied malice murder. *Powell* involved the direct appeal of two defendants—Powell and Langlois—convicted of second degree murder. Langlois contended that his jury may have convicted him as a direct aider and abettor under a legally invalid theory—implied malice murder. *Powell* rejected the argument, in part. The *Powell* court concluded a direct aider and abettor may lawfully be convicted of implied malice murder; however, such a conviction could only be upheld if the instructions were properly tailored.[14] (*Id.* at p. 714.)

---

[14] *Powell*, *supra*, 63 Cal.App.5th at page 713 reiterated our Supreme Court's holding in *Gentile* that following the passage of Senate Bill 1437, direct aiding and abetting implied malice murder remains a valid legal theory. "[N]otwithstanding Senate Bill 1437's elimination of natural and probable consequences liability for second degree murder, an aider and abettor who does not expressly intend to aid a killing can still be convicted of second degree murder if the person knows that his or her conduct endangers the life of another and acts with conscious disregard for life." (*Gentile*, *supra*, 10 Cal.5th at p. 850.)

11

Pertinent to the issues presented here, after dissecting the actus rea and mens rea requirements for aiding and abetting and the actus rea and mens rea for implied malice murder, *Powell, supra,* 63 Cal.App.5th 689 identified a significant omission in the standard aider and abettor instruction in the context of implied malice. *Powell* began by explaining what the law requires. "The mens rea, which must be personally harbored by the direct aider and abettor, is knowledge that the perpetrator intended to commit *the act*, intent to aid the perpetrator in the commission of *the act*, knowledge that *the act* is dangerous to human life, and acting in conscious disregard for human life."[15] (*Id.* at pp. 712–713, fn. omitted.) Then, *Powell*, at pages 706 to 707, contrasted the law with the actual text of CALCRIM No. 401—the aider and abettor instruction.

" 'To prove that the defendant is guilty of a crime based on aiding and abetting that crime, the People must prove the following: [¶] 1. The perpetrator committed the crime. [¶] 2. The defendant knew that the perpetrator intended to commit *the crime*. [¶] 3. Before or during the commission of the

_____

[15] The *Powell* jury was instructed with CALCRIM No. 520, which states: " 'There are two kinds of malice aforethought: [¶] Express malice and implied malice. [¶] Proof of either is sufficient to establish the state of mind required for murder. [¶] The defendant acted with express malice if he unlawfully intended to kill. [¶] The defendant acted with implied malice if: [¶] 1. He intentionally committed *an act*; 2. The natural and probable consequences of *the act* were dangerous to human life; 3. At the time *he acted*, he knew *his act* was dangerous to human life and 4. He deliberately acted with conscious disregard for human life.' " (*Powell*, *supra*, 63 Cal.App.4th at pp. 707–708.)

12

crime, the defendant intended to aid and abet the perpetrator in committing *the crime*; and [¶] 4. The defendant's words or conduct did in fact aid and abet the perpetrator's commission of *the crime*. [¶] Someone aids and abets a crime if he knows of the perpetrator's unlawful purpose, and he specifically intends to and does in fact aid, facilitate, promote, encourage, or instigate the perpetrator's commission of *that crime.*'" (*Powell, supra,* 63 Cal.App.5th at pp. 706–707.)

*Powell* noted, while CALCRIM No. 401 requires the aider and abettor to have *knowledge* of the perpetrator's intent to commit a crime, the instruction fails to explicitly instruct the fact finder that the aider and abettor must have thereafter acted with *conscious disregard for human life* when aiding and abetting the perpetrator's act.[16] (*Powell, supra,* 63 Cal.App.5th at p.714.) *Powell* concluded that using such a flawed aiding and abetting instruction as applied to implied malice is error.[17] (*Ibid.*)

*People v. Langi* (2022) 73 Cal.App.5th 972, 975, 984 (*Langi*), in turn, applied the reasoning of *Powell* when reviewing the denial of a section 1172.6 petition at the prima facie stage. Langi was part of a group of four who punched, kicked and

---

[16] *Powell, supra,* 63 Cal.App.5th 689 also observed another subtle, but important discrepancy between the implied malice and aider and abettor instructions. The implied malice instruction refers to an *act*, whereas aiding and abetting refers to a *crime*. This difference is significant because it too allowed a jury to impute malice based solely on that person's participation in a crime. (*Id.* at p. 714.)

[17] The *Powell* court found the error harmless. (*Powell, supra,* 63 Cal.App.5th at p. 718.)

13

robbed the victim. During the attack, the victim fell, striking his head, which eventually led to his death. (*Id*. at p. 975.) The jury was instructed using the standard CALJIC instructions on first degree felony murder, implied malice (CALJIC No. 8.31) (*id*. at p. 981), and direct aiding and abetting (CALJIC No. 3.01) (*ibid*.), but not on the natural and probable consequences theory. The jury acquitted Langi of first degree felony murder but convicted him of second degree murder, robbery and battery. (*Id*. at p. 977.)

Langi filed a petition for resentencing under the original version of section 1172.6. That petition was summarily denied. (*Langi*, *supra*, 73 Cal.App.5th at p. 977.) During the pendency of the appeal, Senate Bill 775 was passed.

The *Langi* court reversed and ordered an evidentiary hearing on the merits of the section 1172.6 petition. (*Langi*, *supra*, 73 Cal.App.5th at p. 976.) *Langi* found, even without explicit instruction on the natural and probable consequences theory, the record of conviction did not conclusively exclude the possibility that Langi was convicted under Senate Bill 775's newly added imputed malice theory.[18] (*Ibid*.)

In *Langi*, *supra*, 73 Cal.App.5th at page 972, the court recognized the CALJIC instructions for aiding and abetting implied malice murder suffered from the same shortcomings that *Powell* found in the analogous CALCRIM instructions in that

---

[18] The *Langi* court assumed Langi was convicted as a direct aider and abettor. *Langi* also addressed the trial court's erroneous reliance on factual statements contained within the prior appellate opinion at the prima facie stage. (*Langi*, *supra*, 73 Cal.App.5th at pp. 979–980.)

they did not adequately explain the mens rea required for implied malice murder liability. "Although the definition of second degree murder in CALJIC No. 8.31[19] states that the perpetrator must have acted with conscious disregard for human life, the definition of an aider and abettor in CALJIC No. 3.01[20] does not include the same requirement." (*Id.* at p. 983.) More precisely, the *Langi* court found the instructions lacked clarity because they did not "state that the aider and abettor must himself have known that the *act* he aided was life-threatening, or that he must himself have *acted* with indifference to human life." (*Id.* at p. 982, italics added.)

*Langi*, *supra*, 73 Cal.App.5th at page 982, found this instructional imprecision allowed the jury to find Langi "guilty of aiding and abetting second degree murder" by imputing malice

---

[19] CALJIC No. 8.31 states that a killing is a second degree murder if: "1. The killing resulted from an intentional *act*, [¶] 2. The natural consequences of the *act* are dangerous to human life, and [¶] 3. The *act* was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. [¶] When the killing is the direct result of such an *act*, it is not necessary to prove that the defendant intended that the *act* would result in the death of a human being." (Italics added.)

[20] CALJIC No. 3.01 states, in relevant part, that a "person aids and abets the [commission] . . . of a *crime* when he or she: [¶] (1) With knowledge of the unlawful purpose of the perpetrator, and [¶] (2) With the intent or purpose of committing or encouraging or facilitating the commission of the *crime*, and [¶] (3) By act or advice aids, promotes, encourages or instigates the commission of the *crime*." (Italics added.)

15

based solely on Langi's participation in a crime, "without finding that he personally acted with malice," which was now prohibited by Senate Bill 1437 and Senate Bill 775. *Langi* concluded that such a record of conviction does not support summarily denying a section 1172.6 petition at the prima facie stage. "[B]ecause the record of conviction does not conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted" with implied malice, that is " 'with knowledge of the danger to, and with conscious disregard for, human life [citation],' an evidentiary hearing [was] required." (*Id.* at p. 984.)

### B. *Analysis*

At the prima facie stage, the crucial question is whether the record of conviction conclusively eliminates the possibility that Johnson was found guilty of second degree murder on a theory of liability that is no longer valid today.[21]

As a threshold issue, we agree with *Langi* that with the addition of Senate Bill 775's "other theory under which malice is imputed" (§ 1172.6, subd. (a)) language, the lack of instruction on the natural and probable consequences theory is not a categorical

---

[21] Johnson's initial petition fulfilled the three pleading requirements of section 1172.6, subdivisions (a) and (b). Johnson averred in his declaration that he: (1) was charged with murder by means of a charging document that allowed the prosecution to proceed under a theory of felony murder or murder under the natural and probable consequences doctrine; (2) was convicted of first or second degree murder; and (3) could no longer be convicted of first or second degree murder due to the changes to sections 188 and 189 effectuated by Senate Bill 1437.

16

bar for relief, rejecting the Attorney General's argument to the contrary.

We also join *Powell*'s and *Langi*'s assessment that the standard CALCRIM and CALJIC jury instructions are flawed in that they fail to explain the direct aider and abettor's mens rea for implied malice murder—conscious disregard for life. We further agree with *Langi*'s interpretation of Senate Bill 775 that a conviction obtained through such a faulty aiding and abetting instruction qualifies as a conviction obtained under any "other theory under which malice is imputed" (§ 1172.6, subd. (a)), and in the context of evaluating a section 1172.6 petition, such a record of conviction is insufficient to conclusively overcome the prima facie showing.

The trial court here used the same ambiguous CALJIC implied malice and aiding and abetting instructions as in *Langi*: CALJIC Nos. 3.01 and 8.11. The instructions failed to explain that in order to establish that Johnson personally acted with implied malice, the fact finder needed to find that Johnson aided the perpetrator's *act,* with knowledge of the danger to, and with conscious disregard for, human life. In the absence of such precision, it is impossible to conclude that Johnson, as an aider and abettor, personally harbored malice.

Since the trial court here employed the same infirm CALJIC instructions that *Langi* criticized, we cannot conclusively conclude, as a matter of law, that the trial court did not base its judgment of conviction of second degree murder upon a theory of liability that is no longer valid today.[22] As in *Langi, supra,*

_____

[22] Without directly questioning the holding of *Langi*, the dissent contends that *Langi* is inapplicable to the facts here. (Dis. opn. *post*, at p. 5.) The dissent leans on *People v. Coley*

17

73 Cal.App.5th at page 984, "[b]ecause the record of conviction does not conclusively negate the possibility that the jury found appellant guilty of second degree murder by imputing to him the implied malice of the actual killer, without finding that he personally acted 'with knowledge of the danger to, and with conscious disregard for, human life,' " the trial court was obligated to issue an order to show cause and conduct an evidentiary hearing[23] under section 1172.6, subdivision (d)(3).[24]

In Johnson's reply brief and in supplemental briefing he contends he is entitled to an order to show cause as to his

---

(2022) 77 Cal.App.5th 539 for support. The *Coley* panel noted that *Langi* was limited to homicides founded on a theory of implied malice. The defendant in *Coley*, however, was convicted of second degree murder with express malice. (*Id*. at p. 547.) As such, *Coley* concluded, "*Langi* does not apply because that case involves *implied* malice." (*Ibid*.) Here, on the other hand, the Attorney General contends that Johnson's conviction for second degree murder is based on an implied malice theory. With this concession, *Coley*'s distinction of *Langi* has no application here.

[23] At that evidentiary hearing, the prosecution must establish beyond a reasonable doubt that Johnson was "the actual killer or that he was an aider and abettor who facilitated the killing with personal disregard for human life." (*Langi*, *supra*, 73 Cal.App.5th at p. 984.) If the prosecution fails, Johnson will be entitled to relief.

[24] As such, we need not address Johnson's other contentions that even in the absence of instructions on the natural and probable consequences theory, he was actually prosecuted under the doctrine and that the trial court engaged in factfinding.

attempted murder conviction as well. We agree with Attorney General that this issue is not properly raised in this appeal because Johnson did not first seek resentencing on his attempted murder conviction in the trial court by filing a section 1172.6 petition.[25] On remand, Johnson is free to file a 1172.6 petition challenging his attempted murder conviction. If he chooses to file such a petition and the trial court finds a prima facie case is stated, it shall issue an order to show cause and hold an evidentiary hearing. (§ 1172.6, subd. (d)(1).)[26]

---

[25] At the time Johnson filed his original petition, by its express terms, section 1172.6 as enacted by Senate Bill 1437, did not provide relief for a petitioner convicted of attempted murder. However, section 1172.6, subdivision (a), as amended by Senate Bill 775, now provides for relief where the petitioner was convicted of attempted murder. (§ 1172.6, subds. (a) & (a)(3).)

[26] We would note the record of conviction for the attempted murder is hardly clear. For example, the trial prosecutor advanced several theories as to Johnson's culpability to the jury during his closing argument including: "[I]f there is any evidence indicating . . . Johnson and . . . Gilbert assisted in any way or instigated or encouraged or started this whole thing, with the requisite mental [state], they're guilty." "However, if you believe that [Johnson's] mental state was one where he's going to stop the car to find out and—you know, if they are unfriendly gang members, We're just going to scare them out, or We have somebody in the car. Go ahead and do the shooting, that would be a second degree murder." "[W]ould Jimmy Dawson be alive today if . . . Johnson had stopped . . . —not stopped that car? [¶] . . . [¶] I suggest to you that he would." In addition, the primary focus of the motion for new trial hearing was the first degree murder conviction. Both the Attorney General and Johnson agree the trial court rejected the jury's finding that

In closing, we acknowledge the very real challenges trial courts have faced in evaluating section 1172.6 petitions with the rapidly evolving status of the law. We further recognize that at the time the order denying the petition was entered here in 2020, the trial court did not have the guidance of case law on how a trial court should determine whether a petitioner has made a prima facie showing. Nor did the court have the benefit of legislative amendments to section 1172.6 that have further expanded the avenues for relief.

---

Johnson had express malice. The Attorney General asserts the trial court found that Johnson had implied malice while Johnson argues the court based its decision on the natural and probable consequences doctrine. However, neither of those theories can support a conviction for accomplice liability for attempted murder. In *People v. Bland* (2002) 28 Cal.4th 313, 327, our Supreme Court reiterated "that implied malice cannot support a conviction of an *attempt* to commit murder." Senate Bill 775 now prohibits relying upon the natural and probable consequences doctrine. However, we do not reach the merits on issues involving the attempted murder conviction because we are remanding, in part, to allow Johnson to file a petition challenging this conviction.

## DISPOSITION

The order denying the Penal Code section 1172.6 petition is reversed. The matter is remanded with directions for the trial court to issue an order to show cause under section 1172.6, subdivision (c) and hold a hearing pursuant to subdivision (d) as to the murder conviction. On remand, Billy George Johnson may file, and the trial court may consider, a petition challenging his attempted murder conviction.

NOT TO BE PUBLISHED.


KALRA, J.*


I concur:


LAVIN, J.


_____

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

21

EDMON, P. J., Dissenting:

The majority concludes that the trial court erroneously denied Billy Johnson's petition for resentencing under Penal Code[1] section 1172.6. I believe that the petition was properly denied because Johnson was ineligible as a matter of law. Therefore, I respectfully dissent.

Artie Gilbert and Johnson were members of the same gang. In 1990, the victims Jimmy Dawson and Sean Rowe had just left a store when Rowe saw a car stop. Gilbert got of the car and asked Dawson what gang he belonged to. When Dawson named his gang, Gilbert said he didn't get along with that gang and punched Dawson. At trial, Rowe testified that after Gilbert punched Dawson, Gilbert looked at the car and said, "get the gat, cuz, get the gat," referring to a gun. The driver, Johnson, had one foot in the car and the other foot out, and he was looking under the seat. Somebody—apparently not Johnson—got out of the car and fired shots, killing Dawson. When the matter proceeded to trial, the prosecution's theory was that neither Gilbert nor Johnson was the shooter and that a third man was the shooter.

In 1991, a jury found Gilbert and Johnson guilty of first degree murder (§ 187, subd. (a); count 1) and of willful, premeditated, and deliberate attempted murder (§§ 664, 187, subd. (a); count 2) with true findings on principal gun use allegations as to both counts (§ 12022, subd. (a)(1)). However, the trial court granted Johnson's motion for a new trial, reducing Johnson's murder conviction to second degree murder and striking the willful, deliberate and premeditated finding as to the

---

[1] All further undesignated statutory references are to the Penal Code.

attempted murder count. Accordingly, Johnson stood convicted of second degree murder and attempted murder, and the trial court sentenced him to 15 years to life on the murder count plus one year for the firearm enhancement and sentenced him to a concurrent term for the attempted murder.

In 2019, Johnson petitioned for resentencing under section 1172.6. The trial court denied the petition, finding that Johnson had not made a prima facie case because he was not prosecuted under a felony murder or natural and probable consequences theory. It is undisputed that the jury was never instructed on those theories, as the trial court refused to instruct on the natural and probable consequences doctrine.

On appeal, Johnson initially took the position that although the jury was not instructed on the natural and probable consequences theory, the prosecutor argued that theory to the jury, and therefore it was possible he was convicted under it. Then, while the matter was pending on appeal, the Legislature passed Senate Bill No. 775 (2021–2022 Reg. Sess.), which, as relevant here, amended section 1172.6, subdivision (a), to apply to "a person convicted of felony murder or murder under the natural and probable consequences doctrine *or other theory under which malice is imputed to a person based solely on that person's participation in a crime*," and to the crime of attempted murder under the natural and probable consequences doctrine. (Italics added.)

In supplemental briefing, Johnson contended that he was convicted under a theory under which malice was imputed to him based solely on his participation in the crime, that theory being aiding and abetting second degree implied malice murder. That theory, however, remains a valid theory of conviction,

2

notwithstanding Senate Bill No. 775. (See *People v. Gentile* (2020) 10 Cal.5th 830, 847; *People v. Powell* (2021) 63 Cal.App.5th 689, 713 [aider and abettor who does not expressly intend to aid a killing can be convicted of second degree murder if person knows conduct endangers another's life and acts with conscious disregard].)

To support his argument that, notwithstanding that second degree implied malice murder remains a valid theory, he was convicted under an invalid theory of imputed malice, Johnson relies on *People v. Langi* (2022) 73 Cal.App.5th 972 (*Langi*). In that case, Langi and three other men beat the victim, who died from head trauma after falling and hitting his head during the assault. As here, Langi's jury was not instructed on the natural and probable consequences doctrine but was instructed with CALJIC Nos. 3.01,[2] regarding aiding and abetting, and 8.31,[3]

---

[2] CALJIC No. 3.01 provides that a person aids and abets a crime when the person (1) with knowledge of the perpetrator's unlawful purpose and (2) with the intent or purpose of committing, encouraging, or facilitating the commission of the crime, (3) by act or advice aids, promotes, encourages or instigates the commission of the crime.

[3] CALJIC No. 8.31 provides that murder of the second degree is the unlawful killing of a human being when (1) the killing resulted from an intentional act, (2) the natural consequences of the act are dangerous to human life, and (3) the act was deliberately performed with knowledge of the danger to, and with conscious disregard for, human life. When the killing is the direct result of such an act, it is not necessary to establish

3

regarding second degree murder. *Langi* noted that although the aiding and abetting instruction stated that a person aids and abets a crime if the person acts with knowledge of the perpetrator's unlawful purpose and with the intent to commit or encourage that crime, "the second degree murder instruction specified that the direct perpetrator of that crime need not act with the unlawful intent of causing death." (*Langi*, at p. 982.)

The *Langi* court went on, "Thus, while the perpetrator must have deliberately performed the fatal act 'with knowledge of the danger to, and with conscious disregard for, human life' (CALJIC No. 8.31), his purpose may have been only to strike or to injure, or conceivably only to embarrass, the victim. Since the perpetrator's purpose need not have been to kill the victim, the aider and abettor's knowledge of that purpose similarly need not have been knowledge that the perpetrator aimed to kill. If the perpetrator need not have had 'murderous intent,' certainly the aider and abettor need not have had such an intent. Although the definition of second degree murder in CALJIC No. 8.31 states that the perpetrator must have acted with conscious disregard for human life, the definition of an aider and abettor in CALJIC No. 3.01 does not include the same requirement. Thus, under the instructions that were given, the jury was entitled to conclude that, to be guilty as an aider and abettor of second degree murder, appellant need only have intended to encourage the perpetrator's intentional act—in this case, punching Martinez— whether or not appellant intended to aid or encourage Martinez's killing, and whether or not he personally knew of and

---

that the defendant intended his act to result in the death of a human being.

4

disregarded the risk of such a killing." (*Langi, supra,* 73 Cal.App.5th at pp. 982–983.) *Langi*, at page 983, concluded that the instructions should have been tailored to state that, to be guilty as a direct aider and abettor of second degree murder, an accomplice must have acted with the mental state of implied malice.

It is unnecessary to decide whether *Langi* is correct because, here, Johnson was convicted of murder *and* of attempted murder, which requires an intent to kill. Under such a scenario, *Langi* is inapplicable. (*People v. Coley* (2022) 77 Cal.App.5th 539.) In *Coley*, a jury similarly found the defendant guilty of second degree murder and of attempted murder without premeditation. As here, the *Coley* defendant (the driver and nonshooter in a drive-by shooting), relying on *Langi*, argued that he may have been convicted of aiding and abetting second degree implied malice murder. *Coley* distinguished *Langi* because the *Coley* defendant's "conviction for attempted murder demonstrates that he was convicted of second degree murder with express rather than implied malice." (*Coley,* at p. 547.) That is, the jury was instructed that attempted murder requires an intent to kill the person: "An intent to kill is the equivalent of express malice, at least when there is no question of justification or excuse, and by finding appellant guilty of attempted murder, the jury necessarily found he had personally harbored intent to kill or express malice when he aided and abetted the second-degree murder." (*Ibid.*) Because the second degree murder conviction was based on the same shooting that gave rise to the attempted murder conviction, the jury necessarily found there was an intent to kill as to both the murder and attempted murder.

The same is true here. Here, the jury clearly found that Johnson had an intent to kill, because it found him guilty of first degree premeditated murder and of premeditated attempted murder. Thus, any allegedly ambiguous instructions clearly played no role in the jury's verdict. However, the trial court reduced those offenses to second degree murder and attempted murder (striking the premeditation finding). Because attempted murder requires an intent to kill and because, as in *Coley*, the shooting that resulted in the murder of Dawson and attempted murder of Rowe were the same transaction, the trial court necessarily found an intent to kill.

The majority, however, appears to suggest that the attempted murder conviction is problematic because it may have been premised on a natural and probable consequences theory. (Maj. opn. *ante*, at p. 19, fn. 25.) But as the majority recognizes, any such issue is not properly before us because the section 1172.6 petition did not concern the attempted murder conviction.[4] And, as the majority also concedes, the jury was never instructed on the natural and probable consequences doctrine, either as to murder or attempted murder. Indeed, the trial court *refused* to instruct on it.

Instead, the jury was instructed with CALJIC Nos. 6.00 and 8.66 that an attempt to commit a crime consists of two elements, namely, a specific intent to commit the crime, and a direct but ineffectual act done toward its commission. CALJIC No. 8.66 stated that attempted murder requires "the person

---

[4] I agree with the majority that Johnson may pursue any remedies he might have as to that conviction under section 1172.6, as amended by Senate Bill No. 775.

6

committing" the "direct but ineffectual act" "harbored express malice aforethought, namely, a specific intent to kill unlawfully another human being."

Notwithstanding that the jury was never instructed on the invalid natural and probable consequences theory, the majority suggests that the prosecutor argued that theory to the jury and the trial court might have relied on it when it reduced the murder to second degree murder and struck the premeditation finding as to the attempted murder conviction. (Maj. opn., *ante*, at p. 19, fn. 25.) The prosecutor, however, never uttered the words "natural and probable consequences" in front of the jury. Instead, the prosecutor argued that if the jury did not believe there was evidence of premeditation, it should find the defendants guilty of second degree murder with implied malice, i.e., the defendants "consciously disregard[ed] the person's life."

The majority also suggests that the trial court, in ruling on the motion for new trial, relied on the natural and probable consequences theory as to attempted murder, or at least did not find that Johnson acted with implied malice as to second degree murder. (Maj. opn., *ante*, at p. 19, fn. 25.) All the trial court found as to Johnson was that witness/attempted murder victim Rowe was credible, in that he heard Gilbert tell Johnson to get "the gat," and saw Johnson reach down to get something, inferentially the gun. Noting that Johnson came with Gilbert to the scene of the shooting, the trial court found that Johnson shared an intent with Gilbert to do some kind of bodily harm to gang members they found in the neighborhood, and Johnson knew there was a gun in the car.

The trial court then said, "Now, his [Johnson's] thinking at the time could be that he's part of this gang and if he finds any

7

other rival gang members such as 99 Mafia, he knows there is going to be a confrontation and he knows that the confrontation could escalate into a shooting. He stopped the car. He stopped the car, and we can infer from that that he positioned it in a spot where he was close enough to Mr. Gilbert to come to the aid[ ] should the necessity be shown, but far enough away to let Mr. Gilbert do what he was supposed to be doing in the first place. Now, with all of that, I cannot say that this evidence supports a first degree murder conviction. I can see that it supports a second degree murder conviction. His culpability is not the same extent as Mr. Gilbert's. His main problem was driving the car, being in the car with the gun, knowing there was a gun, walking outside—getting out of the car and driving away with Mr. Gilbert after the shooting. But I think it's a reasonable inference that he knew, or had a reasonable expectation of knowing that there was going to be a shooting and that shooting could in fact escalate into a death."

I decline to read the trial court's comments as a reference to the natural and probable consequences doctrine—especially when the trial court *refused* to instruct on that theory. Instead, this experienced trial judge would have been aware, at least based on the attempted murder instructions actually given, that attempted murder requires an intent to kill. (See *People v. Martin* (2005) 127 Cal.App.4th 970, 977 [trial judge is presumed to know and follow the law].) Moreover, even assuming that the trial court believed that Johnson was guilty of second degree implied (rather than express) malice murder, I would decline to find that this experienced trial judge misunderstood that second degree implied malice murder requires a defendant to know that his conduct endangers another's life and acted with conscious disregard to

8

human life.  In short, the record provides no reason to doubt that the trial court understood the elements of attempted murder, aiding and abetting, and second degree murder.

In my view, the trial court's denial of Johnson's section 1172.6 petition without issuing an order to show cause was appropriate.  Accordingly, I would affirm the order denying Johnson's petition.


EDMON, P. J.